[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff in this marital dissolution case is a physician. The defendant is a registered nurse. Both have appeared by counsel. After unsuccessful pretrials the case was heard June 3, 11 and 28, 2002.
After hearing the evidence and reviewing the exhibits the court makes the following findings:
The parties were married in Pomfret, Connecticut on December 25, 1989;
The plaintiff has resided in Connecticut for at least one year prior to the filing of the complaint;
One child, Emily Sachs, born February 27, 1992 has been born issue of the marriage;
No other children have been born to the defendant since the date of the marriage;
Neither party is receiving assistance from the State of Connecticut or any town or municipality.
The parties met in 1987 at a hospital on Long Island in New York State CT Page 9551 where the plaintiff was completing a medical residency and the defendant worked in the emergency room. The defendant had been widowed and had two children. They began dating in December of 1987 and by July of 1988 they had decided to relocate to permit the plaintiff to enter private practice in Plainfield, Connecticut with two other physicians. He started working there in September of 1988. In 1998 they purchased a new residence known as 83 Kearney Road in Pomfret for $298,000. The down payment of $125,000 was made by the defendant from funds received from the sale of her former residence. The home is now worth $310,000 and the mortgage is about $15,000.
After their marriage in 1989 the plaintiff continued in private practice until 1991 when he became an instructor at the University of Massachusetts medical school in Worcester, Massachusetts. For the last five years he has worked at the school in two capacities; he is the assistant director of medical residencies and the director of the primary care clinic. His salary of about $150,000 annually is divided between the two positions. He does some consulting on a part time basis. Until 1992 the defendant worked part-time, between sixteen to twenty hours per week, as a nurse at Day Kimball hospital in Putnam, Connecticut. After the birth of Emily in 1992 she took time off to be at home with her and the defendant's other children, then 13 and 9.
At the time of the marriage of the parties the defendant had an investment account valued at $263,470. The source of this fund was insurance money received after the death of her first husband. This fund's current value is about $225,000.[1] The plaintiff did not contribute to this account. Some $130,000 has been withdrawn over the past few years to pay the college education costs of the defendant's two children. These children have also received $214,574 in social security benefits during the course of the marriage and the funds have been deposited appropriately in the family checking account and used for their benefit. Dr. Sach's salary was deposited in this account as well and used for household purposes.
In 1994 the plaintiff sought legal advice because he felt trapped in his marriage to the defendant notwithstanding his love for their daughter. The parties argued about visits to their respective families and the conduct of the plaintiffs mother. The defendant chose to stay at home rather than travel to New York where her mother-in-law resided because she mistreated her husband and allowed her pets to make a mess of her residence. The plaintiff did not like the defendant's sister and refused to attend her wedding. In 1995 the parties attended marriage counseling sessions briefly. The defendant did not believe their arguments evidenced a problem with their marriage and saw no need for counseling. CT Page 9552
Conflicts arose as the results of the work schedules of the parties.
In 2000, for example, the defendant usually worked twenty-four hours each week, including shifts from 3:30 p.m. to midnight and shifts on weekends. This allowed maximum parenting time for her with the parties' child, Emily.
On those days when the defendant worked, her children helped with Emily and the plaintiff was left "in charge" but disagreements arose because Emily was not put to bed at her regular bedtime.
In 2000, the plaintiff encouraged the defendant to quit her job. The defendant quit her job on September 30, 2000.
Historically, the plaintiff left for work between 5:30 a.m. and 6:00 a.m. and returned home between 7:30 p.m. and 8:00 p.m. If the defendant's work schedule conflicted with his, the defendant either changed her work schedule or her children watched Emily. Babysitters were not employed. The defendant tended to Emily in the mornings, saw her off to school or transported her to school and was present when Emily returned from school. On occasions, the defendant's children helped in this, as well. A greater portion of her work hours were in the evenings or on weekends in order to accommodate the family and the plaintiffs schedule. Mrs. Sachs has continued her education during the marriage and now has a bachelor's degree.
In January of 2000 the plaintiff met a then 26 year old law school graduate whose name is Robin Sheedy. At the time the plaintiff was 41 and the defendant was 46. By May of 2000 the plaintiff and Ms. Sheedy had begun a romantic relationship. The defendant learned of the relationship by accidently looking at the plaintiffs cell phone statement in October of 2000 and discovering numerous calls to a telephone number in Boston, Massachusetts. She called the number and learned of the existence of Ms. Sheedy. When confronted the plaintiff admitted his involvement with her.
The plaintiff left the marital home on March 14, 2001.
By complaint dated March 15, 2001, the plaintiff instituted dissolution proceedings. Shortly thereafter, the defendant returned to work at a reduced schedule of 12 hours each week.
From June 7, 2001 to September 6, 2001, the defendant averaged a net income of $698 per week. She was able to work to that extent because during those months her two children were available to watch Emily while she worked. Also, during that time, pendente lite orders for support were CT Page 9553 not in effect and the defendant did not have adequate financial assistance from the plaintiff to pay the household bills.
At a pendente lite hearing on September 7, 2001 the defendant submitted a financial affidavit that was grossly inaccurate. She reported net income of $303 weekly, less than one-half her actual net income. The requisite finding of contempt is made but is offset somewhat by her explanation that her income in the following months would be reduced because she was taking a new job. She is admonished for her misstatement. No other sanction is imposed. For the year ending December 31, 2001, the defendant's total earned income was $37,497.
In 2002 to date the defendant has averaged $602 weekly net income and the plaintiff averages $1920 net income.
After leaving the defendant the plaintiff in March of 2001 leased a residence in Woodstock, Connecticut, until February of 2002 when he and Ms. Sheedy purchased a home in Pomfret, Connecticut, in close proximity to the marital residence. He received court approval to use $4000 of the marital property to purchase the home. Ms. Sheedy resides there when she is not at her Boston residence.
The defendant plans to complete her courses leading to a master's degree in the next few years. This will enable her to qualify for supervisory positions in hospitals with hours more suitable for the care of Emily. The parties have reached an agreement on a parenting plan for Emily, whose primary residence is with the defendant. Since the separation of the parties the defendant has begun a romantic relationship with Kurt Schmidt, a local resident.
The parties disagree about support, alimony and a property settlement.
After hearing the testimony and reviewing the exhibits the court concludes the marriage has broken down irretrievably and that the plaintiff is more responsible for the breakdown than the defendant. Unquestionably both are responsible for the arguments and disagreements in this fifteen year relationship but it is the involvement of the plaintiff with Ms. Sheedy that brought the marriage to its end. A separation has existed since March of 2001. There is no reasonable likelihood of reconciliation. The marriage should be dissolved.
The court, being mindful of the provisions of Chapter 815j of the Connecticut General Statutes, particularly §§ 46b-81, 46b-82, 46b-87
and relevant case law finds the following orders to be fair and equitable:
CT Page 9554 1. The marriage of the parties is dissolved on the ground of irretrievable breakdown;
2. The plaintiff shall transfer all his right, title and interest in the real property known as 83 Kearney Road, Pomfret, Connecticut to the defendant. The defendant shall pay the mortgage, taxes and insurance and indemnify and save him harmless from the liability thereon. She shall pay him the sum of $85,000 when the minor child Emily graduates from high school or when the defendant sells the home, whichever event shall first occur;
3. Custody and primary residence of the minor child, Emily shall be in accordance with the parenting plan stipulation dated January 2002 which shall be incorporated (see attached stipulation) with the following additional provisions: Each party shall notify the other with ample advance notice of any occasion when they are working or going to school while Emily is in their care and will provide the other with the first option to care to Emily during these occasions;
4. The plaintiff shall pay child support at the rate of $298 per week in accordance with Connecticut Support Guidelines secured by an immediate income withholding and the plaintiff shall be entitled to claim the minor child as a dependent for tax purposes;
5. The plaintiff shall provide medical and dental insurance for the benefit of the minor child as is currently in effect and the parties shall share equally any and all uninsured health care costs for the child, including medical, dental, optical, orthodontia, prescriptive and counseling expenses;
6. The plaintiff shall pay alimony at the rate of $400 per week for a period of seven years to terminate sooner upon either party's death or defendant's remarriage or cohabitation;
7. The plaintiff shall maintain his currently existing life insurance policies in effect naming the defendant the beneficiary until his child support CT Page 9555 obligation and his alimony obligation have both been satisfied. He shall provide authorization to the defendant so she may confirm the coverage;
8. The defendant shall receive by QDRO Fifty (50%) Percent of the plaintiffs University of Massachusetts retirement plan funds, with investment performance, up or down on her allocated share from the date of decree to the date of distribution to her. The court will retain jurisdiction for implementation purposes;
9. Each party shall retain their own IRA account. The defendant shall retain her investment account;
10. Each party shall assume and pay the liabilities outlined in their respective financial affidavits;
11. The defendant shall retain her vehicle, cash value of her life insurance, savings accounts, furnishings and effects at the marital home, with the exception of the items set forth for the plaintiff in Exhibit A attached.
12. Each party shall pay their own attorney's fees.
13. The plaintiff shall receive personal property items contained in his Exhibit A attached.
14. The plaintiff shall prepare the judgment file.
 ____________________, J. Potter, J.
 Exhibit "A" POSSESSIONS:
Garage
John Deere with accessories (chains, weights, plow, broadcaster, gas can) Auto supplies CT Page 9556 Lawn and garden supplies (split) Maul Lawn chairs (split)
Basement
Treadmill Weights Tools and Home Repair supplies Plates/silverware Kitchen table Air Conditioner Patio furniture Books Review and obtain appropriate files
Den
Books CDs Tapes (Italian) Stereo with furniture Computer (when obsolete) College Chair Review and obtain appropriate files Desk materials Art work
Attic
Personal possessions Clothing
Autos
Nissan (for sale; split proceeds less ad) Audi to CS Toyota to HS
NO. FA-01-062589-S
HOWARD SACHS SUPERIOR COURT VS. JUDICIAL DISTRICT OF WINDHAM AT PUTNAM
CYNTHIA SACHS JANUARY, 2002
 STIPULATION TO A PARENTING PLAN
The parties agree to the following parenting plan which shall CT Page 9557 be entered as part of the judgment decree of dissolution of marriage:
1. The parties shall share joint legal custody of Emily.
2. Emily's primary residence shall be with her mother.
3. The parties shall consult and make joint decisions on major issues of Emily's education, particular school, summer camp and activities, as mutually arranged, health care, religion and social life. They shall share information and decisions on Emily's extracurricular activities, medical issues and school-related events and each parent shall keep the other informed of the schedules for Emily's extracurricular schedules, medical appointments, major social activities and school-related events and programs. The parties will work together in good faith to resolve all issues as they arise. However, in the event of an impasse regarding required joint decisions and final decisions regarding Emily's education, particular school, summer camp and activities, health care, religion and social life, they shall consult with a mutually agreed upon third party for mediation and resolution before filing any legal action.
4. Each parent shall provide the other with at least sixty (60) days advance notification of any intention to relocate their residence.
5. Father's parenting time with Emily shall consist of the following:
 Each Wednesday from 5 PM until he brings Emily to school on Thursday, or home by 8 AM,
 Each Thursday from 5 PM until he brings Emily to school on Friday, or home by 8 AM; and
Alternating weekends from Saturday at 10 AM to Sunday at 8 PM.
The parties shall be flexible on the pick-up and return times with a leeway of thirty (30) minutes on either side of the pick-up and return of Emily, and with telephone or e-mail notification.
6. All school vacations shall be shared equally, either by alternating the school vacation, or dividing them in half, as the parents shall mutually arrange.
The parents shall share and refer to Emily's school calendar at the beginning of each school year and plan the winter, spring, Thanksgiving and Christmas vacation periods by November 15 of each year.
7. Monday holidays shall be shared or alternated by mutual arrangement CT Page 9558
8. During the summer school vacation, each parent shall have two uninterrupted weeks of vacation time with Emily, with the summer vacation schedule to be agreed to by the parents by April 1st each year.*
9. Other times for Father as mutually arranged by the parents.
 ___________________________ Howard Sachs
 ___________________________ Cynthia Sachs
STATE OF CONNECTICUT )) ss. NORWICH COUNTY OF NEW LONDON )
On this the 9th day of February, 2002, before me, the undersigned officer personally appeared HOWARD SACHS, known to me to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained.
IN WITNESS WHEREOF, I hereunto set my hand and official seal.
 [EDITORS' NOTE: SIGNATURE IS NON-LEGIBLE] __________________________________ Notary Public
STATE OF CONNECTICUT )) ss. NORWICH COUNTY OF NEW LONDON )
On this the 31st day of January, 2002, before me, the undersigned officer, personally appeared CYNTHIA SACHS, known to me to be the person whose name is subscribed to the within instrument and acknowledged that she executed the same for the purposes therein contained.
IN WITNESS WHEREOF, I hereunto set my hand and official seal.
[EDITORS' NOTE: SIGNATURE IS CT Page 9559 NON-LEGIBLE] __________________________________ Commissioner of the Superior Court